Our second case for this morning is Caroline Guzman v. Brown County, Ms. Hines. Good morning, and may it please the Court, I am Attorney Janet Hines. I represent Caroline Guzman in this case. She spent 11 years as a 9-11 dispatcher for Brown County in Wisconsin as part of their Sheriff's Department. Counsel, when you say 9-11, a 9-1-1 emergency operator, correct? Yes, yes. Dial 9-1-1 emergency operator. And they need to be there on time, on a regular basis, is that correct? Attendance was not an essential function of her job. Okay. How would that be? I was a little bit confused about how your 9-1-1 operator and on-time attendance is not a function of your job. And just from a layperson's perspective, which I think is what the district court came to this with, that on its face seems like an attractive analysis. The problem is the case law says there are a number of different enumerated factors that we have to consider in determining whether something is an essential function of a person's job. And in this particular instance, much like the Romano case we cited, the department had a policy of benefit time, or casual time as they refer to it, that was 40 hours over the course of a year that you could use here and there if you were late to work or if you had some personal emergency to take care of, much like in the Romano case. But I didn't understand that that, two points about that. First of all, I didn't understand that that meant you could just randomly not be there without telling someone. And secondly, I mean, I shared Judge Coleman's bafflement at the idea that an operator in an emergency center doesn't need to be there when scheduled. And it looks to me as though this employer repeatedly told Ms. Guzman precisely that. You know, that whatever the job description said, they were giving her warning after warning after warning, written, oral, you name it, saying, don't be late. And that's where the county's argument breaks down. Because if you look on pages 7 and 8 of the county's brief, they set forth what they allege to be the well-documented disciplinary history of Ms. Guzman. First of all, the county has impermissibly conflated the concepts of performance and attendance. There was never any question. Why are they different? I mean, you're saying that they're different. They're very different because there was no substantive problem with how Ms. Guzman did her job. The only question before this court as conceded by the county is, was her tardiness enough to be terminated without considering her FMLA request and her status as someone with a disability long known to the county? But I'm going to just stay with this for one minute. Certainly. Because even if she was performing fine, as I assume she was, while she was there, it strikes me as only luck if the fact that she was absent during periods of her shift didn't lead to some terrible catastrophe when somebody was trying to get through and there weren't enough other people there to answer the phones or whatever the system is. Well, in theory, that could be a possibility. But there was no evidence of that here, and that never happened. But it's the risk. I mean, the county doesn't want to run a system that's a hit or miss on this. The problem with the county here, though, is during this time period that they are consistently trying to document Ms. Guzman out the door, they have very high turnover and they have vacancies in their positions. And they took an employee who requested FMLA leave and notified them in writing that she had a disability. They disregarded all of that, looked only at her attendance, which was a function of her disability, and said, because of your attendance, you're out. And in this two-page list that's allegedly a disciplinary history, as I set forth in my brief, if you go through it, the only attendance issue in terms of oversleeping and failing to report to work on time, the first one appears toward the bottom of the first page, September 5, 2011. All those prior things that they try to connect here to performance issues and claim that Ms. Guzman had this massive history of problems with attendance, they don't have anything to do with that. I mean, there's vacation time issues, recertification testing not being done. The first verbal warning for failure to report to work on time because of oversleeping was not until a year and a half before her termination. And then if you go through and you similarly analyze the remaining instances and take out the, for example, being late to work because her car didn't start, violating a vacation policy, you come up with only a total of five disciplines in a year and a half relating to attendance, and each one of those is for oversleeping, which her doctor in the note provided to the employer relates to sleep apnea. After the fact. But that's... It's undisputed that she never requested FMLA. No, it is not undisputed, Your Honor. The decision to terminate her, the county claims, was made on March 8th. And they hadn't seen the note yet. That's correct. As you say, she was told she could bring it in, but the fact is... and get a note for this problem with sleep apnea. That's in the record. Well, I mean, I think all of my colleagues are concerned about a number of aspects of this case, including did she really make an FMLA request, the content of the doctor's note, which is a very conditional comment. It actually seems like a truism to me. Don't operate, you know, when you're very sleepy is a translation. And the timing of when they actually saw that note, if they had made up their minds to fire her on the 8th of March, then it actually doesn't matter why they didn't see the note. Except they knew the note was coming and they knew that she had requested FMLA and they knew that she mentioned sleep apnea before the decision was made. Why did they know she'd requested FMLA? Because she told them. Verbally. What did she say? She said, I'm requesting FMLA. Where is that in the record? It is at ECF 29, which was our proposed findings of fact, paragraph 38 in the record. And when did she allegedly say, I'm requesting FMLA? At the time that she told her supervisor that she had spoken to her doctor and he said she might have to get checked for sleep apnea. Now, this was a disability that she'd had going all the way back to 2006. That's the point. That's the point right there. You're trying to extrapolate saying that because she had FMLA and she had issues back earlier that seemed to be resolved by the gastric bypass surgery, that somehow they should have still been on notice that if she started falling asleep again and gaining weight again, that she needed FMLA. And just because she made a few statements to Panur, that the company should already automatically know what she wanted and should abide by that. Isn't that your position? No, Your Honor. We are pointing to, in both the ADA and the FMLA, the employer's affirmative obligation upon understanding that there is a medical condition or disability, depending on which statute, the employer has affirmative obligations to inquire further before they discipline the employee. Under the FMLA, the employee doesn't have to use magic words to request a particular result. She just has to indicate that she has a condition that may require FMLA. So that's a backup position for you because, you know, your opponents certainly take the position she never requested FMLA in a timely manner. Which is a fact dispute. Well, except that then you back up and say, well, there was actually just a conversation, which takes you to Judge Coleman's point that actually they're supposed to intuit that because many years ago she had a problem with sleep apnea, it's come back. I mean, it was resolved for a while. She had a CPAP machine for four years or so. She throws it away. She doesn't need it anymore. Has the bypass surgery. Lots of things happen. So I don't know why the employer, the minute she oversleeps, which is something anyone could do, should say, oh, you know, the sleep apnea has come back. We better see if we can accommodate. Except she told them verbally that she needed FMLA leave. And whether FMLA notice is adequate is a question of fact for decision by the trier of fact. But is your position that she said, quote, I need FMLA leave, or is her position I've been oversleeping, I'm sorry, you know, I didn't hear the alarm, you know, whatever other words. Because you've been making the argument that you don't need to use magic words. And I want to know why that's even relevant. Well, it's valid because you don't have to even mention the FMLA in order to obtain the benefits of the FMLA. In the same way that you don't have to specifically word for word request a particular accommodation in order to get an accommodation under the ADA. Under both statutes, once the employer has knowledge that there is either a medical condition that might be FMLA qualifying or a condition that may qualify as a disability in remission in this case, and perhaps coming back to the fore, once the employer has that information, they have an affirmative obligation to inquire further, to request medical certification, to request a more extensive doctor's note. They ignored all of that and just terminated her. What we're talking about here is, and even though it was documented sleep apnea, we have several years that have gone by. As Judge Wood said, people can oversleep. They don't have to have any other type of circumstances. And in addition, after, as you said, September 2011, between that time and the time she was terminated, she had at least five documented instances. Increasingly close together. So all of a sudden the burden is on the company to try to figure out, even though they're telling her, disciplining her, giving her performance write-ups saying, you overslept again, but she waits until March 8th when it's clear they've had enough of this and says, oh, oh, I'm going to get a doctor's note. And even that doctor's note wasn't even sufficient. It was like, she probably has sleep apnea. How are they supposed to act on that? And you're putting a total burden on her. They are supposed to take that note, and if they don't believe that it supports a request for FMLA leave by itself, they need to tell the employee that and provide her with certification forms to take to her doctor and fill it out. This is part of what the Hansen case decided a couple of years ago in this court, that once you trigger that duty by the employer, they have to take it from there. You don't have to say, I am requesting FMLA leave and fill out whatever forms the employer has before they even consider you. They had a duty to stop, if they didn't believe her or if they needed more information, to stop the termination process and say to her, all right, you said you had this. Prove it. Take this form to your doctor, bring it back to us, and then we'll make the decision. Counsel, let me ask you this. If she had not had this sleep apnea issue before that was documented and whatnot, and then she comes up and it's 2011, and she's falling asleep. Right. She may be overweight, she may have other things going on, but does the mere suspicion without that previous history, does the mere suspicion based on your argument trigger that it's up to the employer, they need to go into FMLA? So you're saying because she had this condition years ago, they should automatically know. No, I'm not saying they should automatically know. I'm saying they should look at this, look at the increasing frequency and smaller amounts of time between the experiences of lateness, particularly being late for work for oversleeping, while you're on suspension for being late to work for oversleeping. I mean, there's testimony in the record that no, I mean, the client was just absolutely horrified that that happened to her. She certainly didn't know what was happening. She talked to her doctor. She told the employer, I think I may be getting my sleep apnea back, and that all of those factors the county should have considered, plus her verbal FMLA request. And I'd like to reserve my remaining time. All right, that would be fine. Ms. Nelson. Good morning. May it please the court, my name is Mary Nelson and I represent Brown County.  Brown County is here before you today requesting that you affirm Judge Riesbach's decision. What is your position on what the verbal outcry to the supervisor about her condition was? Ms. Guzman's testimony during her deposition was that on March 8th, she had a conversation with her supervisor, Mr. Purnor, and asked about obtaining a note from her doctor to excuse her for her tardiness that day. On March 8th? On March 8th. Is there anything before that? No. Doesn't Ms. Guzman say that they're having a conversation, and she says, I think my sleep apnea is coming back. I'm kind of looking at page 16 of the opening brief. She first tells Dave Purnor that she just talked to Dr. Stamm. Dr. Stamm thinks maybe it's the sleep apnea, should be rechecked. She asks Mr. Purnor if a doctor's note would be helpful. He says yes. She gets that note. We can discuss in a minute what it says. It's a little equivocal. But anyway, she gets that note. But Mr. Purnor tells her that she doesn't have to actually tender it to them until she comes back, which winds up being the 15th, by which time they've already decided to fire her. So why wouldn't the tenor of that first conversation make her think that Brown County is going to be to carry her until she's had it rechecked? And keep in mind, none of the Brown County personnel were deposed. And so in his affidavit, Mr. Purnor addressed his recollection of what was happening during that period of time. He didn't recall the use of the term sleep apnea. So what we have to go on, and obviously what you have to go on, and the appropriate way you view the case is from the standpoint of the non-movement because we're at the summary judgment stage. So we can assume she did utter the word sleep apnea to Mr. Purnor. Yes, ma'am. But Mr. Purnor was not the decision-maker with respect to the termination decision. That decision was made by the department head, Mr. Peltier, who did not have any information with respect to sleep apnea, with respect to leave, with respect to disability. All Mr. Peltier knew was that he had a problem employee who was consistently violating the same policy in terms of attendance and tardiness. And you all have read the brief, so you understand the factual history that on February 25th, a three-day suspension was imposed for this very same violation. She had served the first day of the three-day suspension when she was late again. And it's important that at that last meeting in February, she was told that if this happens again, you can, you may be terminated. So she was clearly on notice that termination was the next step. And keep in mind that the county did not simply just rush to termination. It employed its progressive discipline policy with the counseling, with the warnings, with the suspension. And given the fact that the same violation for which she was serving suspension had occurred again, the decision was made by Mr. Peltier on the 8th. So after his conversation, Mr. Pennure reports the fact to Mr. Peltier that Ms. Guzman was once again late. Mr. Peltier, knowing what that history was, made the decision on his own to terminate on the 8th. Now that decision was not communicated to Ms. Guzman until all of them could get together on the 15th. But it's important in terms of what was his state of mind on the 8th and what he knew, and it's undisputed. In terms of the basis for his opinion, or excuse me, for his decision, was the repeated violation of a very important policy that the department had. And he had no information with respect to sleep apnea. So she has no evidence at all that Mr. Pennure passed along, that he always passed along, or whatever kind of inferential mechanism there might be to Mr. Peltier, this history. No, Your Honor. And as a matter of fact, it's undisputed at this point that that information was not passed along by Mr. Pennure, from Mr. Pennure to Mr. Peltier. And that was an important fact that the district court relied on in its determination, and certainly there are many other facts. Was Mr. Peltier the director when she had the sleep apnea and the leave before? No, and I do have his affidavit here. I'm not sure that he was even with the county at that point. But if we go back to the 2006, it's undisputed in terms of the diagnosis of the sleep apnea in 2006 and the treatment. During the course of discovery, I obtained the certified records, so we know that. We know in terms of the county standpoint, because obviously you need to understand that, that for a number of years, Ms. Guzman had taken FMLA leave for various reasons. It's undisputed that none of those FMLA leaves in the past were for sleep apnea. So even in 2006, when she was diagnosed and treated for sleep apnea, she did not use FMLA leave at that time. The county's knowledge with respect to that, so none of the prior FMLA was for the sleep apnea. Could I just ask you though, wouldn't Mr. Peltier have had some kind of file on her in front of him when he made the decision to terminate it? Wouldn't the county keep records along the lines of what you've set forth on pages 7 and 8? Judge, again, my understanding is that that information would have been maintained by Human Resources and not by the department head. And so Mr. Peltier would just fire somebody without looking at the Human Resources file? Mr. Peltier made his decision based upon his knowledge of the policy violations and had no reason in terms of the information that he had before him when he made his decision to inquire any further or to have that type of discussion. I'm just very surprised that just as a matter of management, if you're about to fire an employee, you wouldn't call up the Human Resources file and just browse through it. And Your Honor, and I'm not suggesting that Human Resources was not involved in this process. That record is not before you, and so I certainly want to be careful in terms of my statements to you. I know that there was a process, meaning that Human Resources would have been involved in terms of notify, as well as the county executive. Any termination has to ultimately go through the county executive. But as to exactly what that process was, I don't want to misstate or misspeak. And certainly from the county standpoint in terms of why that particular information wasn't contained in any affidavit or supplemental affidavit. Excuse me, of Mr. Peltier. It's because it wasn't material to the county's arguments, and it wasn't something that was identified as needing to be addressed in response to the plaintiff's brief. Ms. Guzman's employment followed repeated violations of an attendance policy over a period. We're talking about 19 months, and as I pointed out, during which the progressive discipline of policy was implemented. She's got the two claims. She's got the FMLA interference, and she's got the ADA. She's got retaliation and then the Rehabilitation Act. Very briefly with respect to FMLA interference and the ADA, I understand there are different elements, but some common ones that are important. Number one, it's the county's position, and the record is undisputed, that she did not establish having a medical condition or a disability at the time the termination decision was made. So I take it it's the county's position that if somebody comes in with a doctor's note that says, I think X condition is likely. Please test, which is more or less what Dr. Stamm said. He doesn't firmly say, I agree with you, he doesn't firmly say she has the sleep apnea again, but he thinks it's the most likely, and he wants her to be tested. But you don't think that triggers any duties under the ADA or the FMLA? I don't, Judge, and if we look at the four corners of that particular note, Dr. Stamm, and keep in mind, Dr. Stamm is her psychiatrist. He never diagnosed, he never treated that condition, that's undisputed. But the note states, the above patient most probably has sleep apnea. Please excuse her tardiness due to oversleeping. First of all, the county... And please retest, and she needs retesting. Yes, Your Honor, and she needs to be retested and treated for that condition. Absolutely, that's the full content. As we know, Ms. Guzman actually didn't oversleep that day. If you want to get hyper-technical, she actually woke up and then went back to sleep. But the sole purpose of that excuse was to provide an excuse for her for the tardiness that day. This particular note from Dr. Stamm did not speak to leave, it did not speak to time off, it did not speak to a disability. It simply just said, please excuse her for having been late on the 8th, and that's it. It's my understanding also that she did not present that note to her supervisor until March 15th, and by then the decision had already been made that she would be fired. Yes, Your Honor, that is correct. So in terms of notice, it came far too late in the day. It did, and so we've got no proof of a medical condition, no evidence of actual or constructive notice. And so for those reasons, and also the absence of causation, all of the points that Judge Griesbach hit on in his decision. But, counsel, you do have the history back in 2006 of her having the condition. You're absolutely right, Judge, and it's undisputed. But even Ms. Guzman, when I took her deposition, testified that as of February, March 2013, when she has the February discipline, is late again on the 8th, her testimony was that she didn't even know whether she, in fact, had sleep apnea. This was something that she was simply speculating or guessing about. And keep in mind, this note only came about by way of a telephone call that she made to him at the conclusion of her shift. Before Dr. Stamm wrote this note, he did not examine her. He did not see her. It was simply... Well, that would go to the weight, surely. Absolutely, but in terms of placing the context. So we've got that history. But we've got almost a seven-year gap because there was no medical treatment, there's no demonstrated knowledge on the part of the county. But more importantly, Judge, the plaintiff herself did not even know if, in fact, she had sleep apnea in February and March. She was guessing, she was speculating, and did nothing about it, but she herself did not know if sleep apnea was the reason, was the explanation for why she was tardy. This was simply speculation and guessing on her part. And I can tell you that as of the time of her deposition, because it was addressed in the briefs, and certainly Judge Griesbach mentioned it as well, that even at the time of her deposition, in January of 2016, she still didn't know the answer to that question because she had never been retested. Right. She says she had no money, no insurance policy, lots of other things. So I guess that's an understandable reason. With respect to the retaliation claims that she makes with respect to both FMLA and ADA, it's the county's position that given the history and the fact that the termination decision was made by Mr. Pelletier on March 8th, that any request for leave or any mention of that on March 15th was not a cause of the termination decision, and that with respect to the issue of similarly situated people, I think the record is clear. There's just nothing there to support that finding. Unless you have any more questions, I will conclude, and thank you very much for your time this morning. Thank you as well. Anything further, Ms. Hines? The floor is yours. Addressing further the lack of information passed on from Ms. Guzman's supervisor, Penur, to the ultimate decision maker, Pelletier, two points. One, it was his legal duty to pass it on. He, as a supervisor, had been told by an employee that she may have a medical condition that could be either FMLA qualifying or a disability. It was his duty to pass that on. He has a duty for suspicion, just a mere suspicion by an employee. He has a duty to pass that on. Yes, and even if the court disagrees with me on that point, I have one other point to make about the March 15th meeting, the termination meeting. Even if we set aside what happened on March 8th completely, there's evidence in the record which is disputed, but the plaintiff did present evidence that in the termination meeting there were present her supervisor, Mr. Pelletier, and human resources, and that during the course of that meeting, she verbally, again, requested FMLA, and she requested time off from work to get retested for sleep apnea. Now, if we allow an employer to say, oh, well, before we heard all this information, we already decided to terminate you, does that mean that once the employer is aware that their decision may be illegal, that they have no obligation to go back and rethink it before it's executed? I don't think that should be the policy that this court should give lower courts the authority to do. One other quick point about the prior FMLA leaves. If you look back at the prior use of FMLA by Ms. Guzman, all of those were continuous leaves, and it appears from the facts here that an intermittent FMLA leave would have been more appropriate for her, but it's possible that she may not even have known that such an option was possible, and that's where the employer's affirmative duty to advise her of that comes in. And as to Attorney Nelson's point about only speaking to Dr. Stamm on the phone on March 8th to get her note, she ignores the evidence in the record that we presented below that two weeks prior to that, she had gone to see Dr. Stamm in person and that he had said the same thing at that time, and the county had that medical record and acknowledges that the record says that, and we think the court should consider that as well. All right, thank you very much. Thank you. Thanks to both counsel. We'll take the case under advisement.